DECISION
These consolidated actions concern whether John R. Dionne ("Dionne"), a former employee of the City of Woonsocket who resigned from his position as Director of Human Services/Administrative Assistant to the Mayor in 2007, is legally entitled to post-resignation healthcare benefits and pay for unused sick time pursuant to the Benefits Agreement that he entered into with former Mayor Susan D. Menard and the administrative decision of the Woonsocket Personnel Board enforcing the Agreement. After a thorough review of the record, the motions and memoranda filed and the oral arguments presented by the City of Woonsocket, Dionne, and the Woonsocket City Council, as intervenor, this Court finds, as argued by the City *Page 2 
and the City Council, that the Personnel Board lacked jurisdiction to adjudicate this dispute because Dionne was not a classified employee. It accordingly grants summary judgment in favor of the City and the City Council with respect to the City's administrative appeal in City of Woonsocket v.Dionne, C.A. No. PC/08-0400 (R.I. Super. Ct. Jan. 22, 2008), denies the cross motion for summary judgment filed by Dionne with respect to that appeal, and vacates the decision of the Woonsocket Personnel Board granting Dionne his requested benefits.
This Court also finds, as argued by the City Council, that Dionne is not legally entitled to his claimed benefits under the Benefits Agreement with the former Mayor because the Woonsocket City Council never ratified that Agreement or approved such benefits legislatively, and the benefits awarded violate the Woonsocket City Charter and Ordinances, thereby rendering the Agreement ultravires. It thus grants summary judgment in favor of the City Council and denies the cross motions for summary judgment filed by Dionne and the City in both consolidated cases, denies and dismisses Dionne's contract-based counterclaim in City of Woonsocket v.Dionne, C.A. No. PC/08-0400 (R.I. Super. Ct. Jan. 22, 2008), and denies and dismisses his contract action in Dionne v. City ofWoonsocket, C.A. No. PC/08-2805 (R.I. Super. Ct. April 10, 2008).
 I FACTS AND PROCEDURAL HISTORY[1]
John Dionne served on the Woonsocket City Council from December 1977 through December 1987. He served as the Public Safety Director for the City of Woonsocket from March 1989 through most of December 1994. He did not work for the City again until April *Page 3 
1999, when he became the Manager of the Board of Canvassers for the City of Woonsocket.[2] He served in that capacity until he was appointed Director of Human Services and Administrative Assistant to the Mayor in April 2006.[3] Shortly after his appointment, Dionne executed a Benefits Agreement with then Mayor Susan D. Menard, dated May 9, 2006, that provided in relevant part:
 BENEFITS AGREEMENT The Woonsocket City Charter requires the Mayor to appoint individuals to serve as Directors to various departments of City government.
 All other City of Woonsocket employees are covered by either the Personnel Code or a Union Contract. However, paid full-time appointees of the Mayor have no formal agreement that spells out what their benefits are.
 In order to provide those individuals with a formal agreement, I hereby promulgate the following benefits to the individuals listed below:
 . . .
 Director of Human Services John R. Dionne
 . . .
 1. Severance Pay
 Upon termination of employment, voluntary resignation or retirement, Directors shall be entitled to severance payment as defined by this document.
 . . .
 5.2 Unused sick time may in part or full be paid to any Director upon employment termination. The City shall pay upon retirement or death, the amount of unused sick leave to . . . the employee. . . . For involuntary termination or ending of appointed term in office, the City shall pay the Director (60%) of accrued sick time. No sick time shall be paid upon a voluntary termination.
 . . . *Page 4 
 6. Benefits shall include . . . health and dental coverage. . . . All benefits shall be retroactive to each individual's date of employment/appointment in City government in a full time position (appointed or classified position). Said individuals shall receive all benefits as per existing policies in effect for Professional and Technical Employees Local 3851 union and nonunion municipal personnel, including current policy regarding the subject of bridging.
 . . .
 *Directors' contracts shall be either re-endorsed upon the commencement of the Mayor's new term or shall in the alternative be deemed to be administratively extended until another is duly appointed.
(Benefits Agreement at 3, Ex. 1 to Dionne's Mem. March 25, 2009.)[4] The "existing policies" referenced in the Benefits Agreement referred to the "Agreement Between R.I. Council 94, AFSCME, AFL-CIO on Behalf of City of Woonsocket, Rhode Island and Professional and Technical Employees Local 3851" (the "Collective Bargaining Agreement") that governed relations between the City and its employees from July 1, 2005 through June 30, 2008. The Collective Bargaining Agreement provided in relevant part:
 14.1 The city shall make available a group medical and hospital insurance policy, family and single plans, as appropriate. . . . Retirees will continue coverage until age 65 and pay whatever co-pay dollar amount that was in effect at the time of their retirement. The city shall supplement Medicare entitlement to retirees and spouses by Blue Cross Plan 65. . . . [T]he level of benefits shall remain substantially the same. . . .
 . . .
 14.3 Employees hired after July 1, 1996 who retire shall be eligible for the retirees benefits provided they have worked for the City of Woonsocket for ten (10) consecutive years prior to retirement and qualify as vested employees in the Municipal Employees Retirement Plan and commence receiving benefits from the plan upon retiring. . . . Everyone hired prior to July 1, 1996 must be *Page 5 
eligible to receive Social Security Retirement income or the State System Retirement Benefit upon their retirement from the City to obtain this benefit.
(Collective Bargaining Agreement at 11-13, App. to Mayor's Mem. 4-9, March 23, 2009.)
On July 17, 2007, Dionne sent the Mayor a letter of resignation that stated: "Effective today, I hereby resign my position as Director of Human Services/Administrative Assistant to the Mayor." (Ex. 13 to Dionne's Mem.) The next day, on July 18, 2007, he submitted to the Woonsocket Personnel Department the forms necessary to effectuate an immediate retirement. According to former Mayor Susan Menard, Dionne's resignation was for the purposes of retirement. (Ex. 15 to Dionne's Mem.) Thereafter, Dionne began receiving his pension. No party challenges his right to this pension. Dionne also continued to receive medical coverage after his resignation, though he was not paid for the value of his remaining sick days.
On December 12, 2007, the Woonsocket City Solicitor, Christopher Lambert, wrote a letter to Dionne denying him continued healthcare benefits and payment for unused sick time and recommending that he file a grievance with the Woonsocket Personnel Board to contest the denial. See Ex. 5 to Dionne's Mem. On December 14, 2007, Dionne filed a grievance with the Personnel Board that the Board heard at its January 16, 2008 meeting.[5] At the hearing, then President of the Council and now Mayor Leo Fontaine questioned the jurisdiction of the Personnel Board to hear or decide the matter and requested a postponement of the hearing so that the rest of the City Council might "read and absorb" the pleadings. See Mins. of Jan. 16, 2008 Mt'g of Woonsocket Personnel Bd., Ex. 4 to Dionne's Mem. The Personnel Board rejected his request. Id. Dionne then asked that the Personnel Board to deliberate in executive session, *Page 6 
closed to the public. Id. at 2. The Personnel Board granted this request and closed the meeting. Id. After deliberating in executive session, the Personnel Board came back into regular session and voted unanimously to sustain Dionne's grievance, finding that he had ten consecutive years of employment (with bridging) so as to entitle him to the same healthcare benefits and payment for unused sick time that were paid to union employees under the Collective Bargaining Agreement. Id. Its decision effectively granted him post-resignation healthcare benefits and payment for unused sick time.[6]
The City, acting through its City Solicitor, Robert Iuliano, filed a timely appeal to this Court from the decision of the Personnel Board. See City of Woonsocket v. Dionne, C.A. No. PC/08-0400 (R.I. Super. Ct. Jan. 22, 2008). It sought to overturn the decision of the Personnel Board so as to deny Dionne post-resignation payment for unused sick time and continued health coverage. On January 24, 2008, Dionne answered and filed a counterclaim sounding in contract, and premised on the Benefits Agreement, by which he sought temporary and permanent injunctive relief to bar the City from removing his Medicare supplemental health coverage as a retiree and to permanently enjoin the City from removing his healthcare benefits and all other benefits granted to him by the City or the Personnel Board. On January 25, 2008, a hearing justice of this Court entered a consent order requiring the City to continue to provide Dionne with his healthcare benefits and requiring Dionne to place the value of those benefits ($182.58 per month) in escrow pending further order of the Court. On March 17, 2008, Dionne filed a *Page 7 
memorandum in support of his request for benefits, arguing his entitlement to post-resignation healthcare benefits and payment for unused sick time under the Benefits Agreement, consistent with the City's past practice with similarly situated municipal employees and the terms of the Collective Bargaining Agreement applicable to union employees. Attorney Joseph F. Larisa, Jr. filed an entry of appearance on behalf of the City in this case on March 19, 2008.
On April 10, 2008, Dionne filed in this Court a separate contract action against the City, mirroring his counterclaim in City ofWoonsocket v. Dionne, C.A. No. PC08-0400 (R.I. Super. Ct. Jan. 22, 2008), by which he sought enforcement of his Benefits Agreement with the former Mayor and corresponding injunctive relief. Dionne v. City ofWoonsocket, C.A. No. PC08-2805 (R.I. Super. Ct. April 10, 2008). On July 14, 2008, with the agreement of the parties, this Court consolidated that action (C.A. No. PC08-2805) with the administrative appeal filed by the City (C.A. No. PC08-0400) and set a briefing schedule.
On June 19, 2008, Dionne filed a supplemental memorandum in support of his request for benefits, defending the jurisdiction of the Personnel Board and its ruling in his favor on his grievance against the City by which it found that he was entitled to his claimed benefits. On July 24, 2008, Dionne filed a motion for a preliminary injunction to require the City to provide him with those benefits. On September 9, 2008, the City, through attorney Iuliano, filed a memorandum in response to Dionne's memoranda, challenging the jurisdiction of the Personnel Board and arguing the absence of authority to deny him his claimed benefits. Later that same day, the City Council, through attorney Larisa — co-counsel of record with attorney Iuliano for the City — filed a motion to intervene in the case and a proposed memorandum in draft form arguing against Dionne's contractual demand for lifetime healthcare benefits and payment for unused sick time. It sought intervention because its review of the City's memorandum, filed *Page 8 
earlier that day, showed that it failed to make "several powerful arguments" challenging Dionne's contract claims for benefits. The City Council principally attacked the City's failure to argue that the Benefits Agreement signed between Dionne and the former Mayor is ultra vires and unenforceable because the City Council neither ratified it nor approved the post-resignation benefits awarded therein and the award of those benefits contravenes the Charter and Ordinances. On October 8, 2008, Dionne filed an objection to the City Council's motion to intervene.
This Court convened a conference on February 20, 2009 to address what had emerged as a conflict of interest on the part of counsel for the City and counsel for the City Council.[7] It entered an order dated March 6, 2009, by agreement of the parties, requiring the City and the City Council to file a joint stipulation resolving any conflict forthwith, reserving decision on the City Council's motion to intervene and setting a further briefing schedule. The parties agreed that Dionne's previously filed memorandum and supplemental memorandum in support of his request for benefits would be considered as memoranda in support for his motion for a preliminary injunction and that the City and City Council would have an opportunity to file responsive memoranda. To resolve the conflict, the City — through former Mayor Menard — and *Page 9 
the City Council agreed by stipulation filed on March 19, 2009 and signed by attorney Iuliano, on behalf of the City, and attorney Larisa, as counsel for the City Council, that the City Council could move to intervene;[8] attorney Larisa would represent the interests of the City Council and attorney Iuliano would represent the interests of the City in the pending case. These parties agreed further to waive any conflict of interest on the part of either counsel.
The City Council filed its memorandum opposing Dionne's request for a preliminary injunction on March 19, 2009. On March 23, 2009, the City filed a memorandum in favor of Dionne's request for a preliminary injunction in the contract action (C.A. No. PC08-2805) and against his request for injunctive relief in the administrative appeal (C.A. No. PC08-0400). On March 25, 2009, Dionne filed his response to the memoranda filed by the City and the City Council. This Court convened a conference on April 24, 2009, at which the parties agreed to treat Dionne's motion for a preliminary injunction and the other parties' responses thereto as cross motions for summary judgment. On July 9, 2009, the City Council filed a reply memorandum in support of its motion for summary judgment and in opposition to the cross motions for summary judgment filed by Dionne and the Mayor.
In essence, therefore, the City and the City Council have moved for summary judgment in the administrative appeal (C.A. No. PC08-0400), arguing that the decision of the Personnel Board cannot stand because it lacked subject matter jurisdiction to decide Dionne's grievance. Dionne has asserted a cross motion for summary judgment in that case to defend the Board's jurisdiction and its decision. With respect to Dionne's contract action (C.A. No. PC08-2805), and *Page 10 
his counterclaim sounding in contract in the administrative appeal (C.A. No. PC08-0400), the City Council has moved for summary judgment on the grounds that Dionne's claim for benefits under his Benefits Agreement with former Mayor Menard is ultravires and unenforceable because the City Council did not ratify the agreement or approve such award of benefits and the award of those benefits contravenes the Charter and Ordinances. In response, the City and Dionne have asserted a cross motion for summary judgment seeking an award of continuing health care benefits and payment of unused sick time to Dionne, arguing that the Benefits Agreement is valid and that he is entitled to those benefits as a matter of law.[9]
 II ANALYSIS a. The City's Appeal from the Decision of the WoonsocketPersonnel Board
This Court turns first to the City's appeal from the decision of the Woonsocket Personnel Board that sustained Dionne's grievance and awarded him post-resignation healthcare benefits and payment for unused sick time. The City and the City Council argue that the Board lacked subject matter jurisdiction to hear Dionne's grievance because the Charter and governing ordinances only authorize the Board to hear grievances from "classified" employees; as Dionne, in his former capacity as the appointed Director of Human Services/Administrative Assistant to *Page 11 
the Mayor was not a "classified" employee, they contend that the Board should not have heard and decided his grievance.[10]
In response, Dionne claims that the Woonsocket City Solicitor's advice to him to file a grievance with the Personnel Board binds the City to the Board's ruling and constitutes a waiver by the City of any objection to the Board's jurisdiction. Dionne also contends that the right to file a grievance with the Board is one of the benefits conferred by the Benefits Agreement.
In addressing the question of the Personnel Board's jurisdiction, this Court must begin with an examination of the Home Rule Charter and Election Law of the City of Woonsocket (as revised eff. Nov. 6, 2001) (the "Charter") and the Code of Ordinances of the City of Woonsocket (eff. Aug. 5, 2002, as amended) (the "Ordinances") enacted pursuant to the Charter. Chapter IX of the Charter, entitled "Personnel," establishes a Personnel Division within the Finance Department of the City and requires the City Council to adopt by ordinances a "classification plan," a "pay plan" and "personnel policies regarding vacation, sick leave, overtime pay and the dismissal of classified employees." (Charter, Ch. IX, §§ 1, 3(a)-(c).) It also creates a Personnel Board to approve the assignment of classified employees to the appropriate position classifications by the Personnel Director,id. § 4, and assigns the Board the following duties:
 (a) To certify that persons appointed to positions in the classified service . . . actually possess the qualifications required by the classification plan.
 (b) To recommend pay scales. . . .
 (c) To advise and assist the personnel director on problems concerning personnel administration and the improvement or [sic] personnel standards in the municipal service.
 (d) To conduct grievance hearings as required. *Page 12 
Id. § 7 (emphasis added). Under the express language of the Charter, however, the classification plan adopted by the City Council and administered by the Personnel Director with the approval of the Personnel Board, id. § 4, applies to:
 all city employees, including heads of divisions or subdivisions within departments but excepting elected officials, heads of departments and agencies appointed by the mayor or council.
Id. § 3(a) (emphasis added).
A fair reading of the Charter, therefore, is that the jurisdiction of the Personnel Board is confined to employees in the classified service. Any grievance hearings conducted by the Personnel Board, pursuant to § 7 (d) of Chapter IX of the Charter, thus would be confined to disputes filed by classified employees who, by definition pursuant to § 3 (a) of Chapter IX of the Charter, do not include heads of departments or agencies appointed by the Mayor.
This interpretation of the Charter is confirmed by the language of the Personnel Ordinance that the City Council adopted pursuant to the Charter. See City Ord. No. 1865, App. A (enacted March 2, 1964, as amended). By definition, the Personnel Ordinance only applies to "positions in the classified service."Id. § 3.2. The classified service is limited to those "offices and positions of trust or employment in the service of the city . . . that are specifically listed in this ordinance."Id. § 2.1 (h). The list is confined to union and non-union classified employees and notes their class pay grades and basic work hours. Id. § 5.3. The Personnel Ordinance does not include any heads of departments or agencies appointed by the Mayor or other mayoral appointees serving at the pleasure of the Mayor — such as the Director of the Department of Human Services or Administrative Assistant to the Mayor — presumably because the Charter exempts those employees from the classified service.Id. *Page 13 
After outlining the purpose of the Personnel Ordinance as insuring that present and future classified employees are placed in positions based only on merit, id. § 3.1, it outlines the duties of the Personnel Board, as follows:
 (a) To elect one of its members as chairman . . .;
 (b) To certify that persons appointed to positions in the classified service . . . actually possess the qualifications required by the classification plan;
 (c) To recommend pay scales . . .;
 (d) To advise and assist the personnel director on problems concerning personnel administration and the improvement of personnel standards in the municipal service;
 (e) To review the qualifications of any person for the purpose of determining his [or her] eligibility under the classification plan . . .;
 (f) To certify to the personnel director that such person is eligible for appointment to the class of position in the city service for which he or she is qualified;
 (g) To conduct such hearings, as are provided for in this ordinance.
Id. § 3.4 (emphasis added). These duties are consistent with the powers delegated to the Personnel Board in the Charter. (Charter, Ch. IX, §§ 3, 4, 7.) The hearings provided for in the Personnel Ordinance include grievance proceedings between the City and its classified employees over the provisions of the Personnel Ordinance. Id. § 12. The Personnel Ordinance makes clear, therefore, that it applies only to those classified employees that it lists and that the power of the Personnel Board to hear grievances extends only to grievances filed by those listed classified employees.
In the case at bar, Dionne served as the Director of Human Services and Administrative Assistant to the Mayor, appointed by the Mayor. As such, he was not a "classified" employee over whom the Personnel Board could exercise jurisdiction under the Charter and the Personnel Ordinance. Dionne and former Mayor Menard recognized this absence of jurisdiction by explicitly providing in the Benefits Agreement that "[a]ll other City of Woonsocket employees *Page 14 
are covered by either the Personnel Code or a Union Contract" but that appointees of the Mayor are not. (Benefits Agreement at 1.) This Court thus finds that the Personnel Board did not have jurisdiction to hear Dionne's grievance.
Moreover, this Court must reject Dionne's claim that the Benefits Agreement and letter from the City Solicitor conferred upon him the right to file a grievance with the Personnel Board and conferred jurisdiction upon the Board to hear and decide that grievance. The jurisdiction of the Personnel Board is established by the Charter and Personnel Ordinance and is confined to hearing personnel matters concerning classified employees; neither the Mayor nor the City Solicitor has the authority to augment that jurisdiction by contract or representation. McGann v. Bd. of Elections,129 A.2d 341, 348 (R.I. 1957) (citations omitted). Thus, even if the Benefits Agreement or advice of the City Solicitor could be construed as conferring upon Dionne the right to file a grievance with the Board, in contravention of the City's Charter and Personnel Ordinance, that right would be unenforceable and could not confer jurisdiction upon the Board where none otherwise exists.Id.
Likewise, Dionne's claim that the City waived any objections to the jurisdiction of the Personnel Board or that the City should be estopped from contesting the jurisdiction of the Board because it consented to the Board's jurisdiction by appearing before it with respect to Dionne's grievance cannot be sustained. It is well-settled that the issue of jurisdiction can be raised at any time and that parties cannot waive or consent to jurisdiction and allow a tribunal to exercise jurisdiction over a matter over which it has no authority to rule. See Castellucci v.Castellucci, 352 A.2d 640, 642 (R.I. 1976).
As the Rhode Island Supreme Court has explained:
 It is a principle which does not require the citation of authority that jurisdiction of the subject matter cannot be waived, or, as it is *Page 15 
otherwise stated, cannot be conferred by consent of parties. If a tribunal transcends the limits which the constitution or the law has prescribed for it and assumes to act where it has no jurisdiction its acts will be utterly void. Any act of a tribunal beyond its jurisdiction is null and void. . . .
McGann, 129 A.2d at 348 (quoting Welton v. Hamilton,176 N.E. 333, 338 (Ill. 1931) (emphasis added). Here, as the Personnel Board did not have jurisdiction to hear and decide Dionne's grievance, and as the parties cannot by consent or waiver confer jurisdiction upon the Board, its decision to sustain Dionne's grievance and award him post-resignation healthcare benefits and payment for unused sick leave was in excess of its jurisdiction and void. Accordingly, this Court grants the motions for summary judgment of the City and City Council and denies Dionne's cross motion for summary judgment in the administrative appeal (City ofWoonsocket v. Dionne, C.A. No. PC08-0400), thereby sustaining the City's appeal from the decision of the Personnel Board and vacating that decision for lack of jurisdiction.
b. Dionne's Contract Claims to Enforce his Benefits Agreementwith the Mayor
Dionne's counterclaim for breach of contract in the administrative appeal and his complaint for breach of contract in his later filed contract action turn exclusively upon the enforceability of the Benefits Agreement that he entered into with the former Mayor in May 2006. Dionne and the City claim that the Benefits Agreement, by its terms, specifically allows Dionne to receive continuing healthcare benefits and collect the full value of his accrued sick leave.
The City Council disagrees, arguing that Dionne's contract actions should be dismissed because the Benefits Agreement upon which he relies is ultra vires: the City Council neither approved it nor the benefits it awards and its terms violate the Charter and Ordinances. It claims that the Benefits Agreement constitutes an "appropriation," "grant of privilege" or "fixation of *Page 16 
compensation" that the Charter dictates must be approved by the City Council. (Charter, Ch. III, §§ 3(b), 3(d) 3(g).) It also argues that the Benefits Agreement, by ostensibly awarding Dionne healthcare benefits and payment for unused sick time following his resignation, retirement or termination of employment, grants him "severance pay" that is prohibited by the Ordinances. See City Ord. Ch. 2, Art. II, § 2-34 (prohibiting severance pay to directors or appointed personnel who are replaced or who resign). Additionally, although a City ordinance creates eligibility for post-retirement healthcare benefits, see City Ord. Ch. 2, Art. II, § 2-14.4(b), the City Council contends that Dionne's position was not comprehended in the list of positions eligible for such benefits and that the absence of Dionne's position in the enumeration of eligible positions definitively supersedes the Benefits Agreement's award of healthcare benefits to Dionne upon voluntary termination, resignation or retirement.
In contrast, Dionne and the City read the healthcare ordinance as entitling Dionne to healthcare benefits upon retirement.See id. They argue, therefore, that the Benefits Agreement is enforceable as it incorporates these legislatively sanctioned benefits. Dionne and the City further maintain that the Benefits Agreement reflects an appropriate exercise of executive power. The City highlights a clause in the Charter that prevents members of the City Council from "interfer[ing], directly or indirectly, with the conduct of any department" or "tak[ing] any part in the appointment, promotion, or dismissal of any officer or employee in the service of the city" as proof that the Mayor does not need City Council approval for agreements such as the Benefits Agreement. Id. Ch. XVI, Art. 3, § 1. The City and Dionne further argue that the Benefits Agreement is not an appropriation, grant of privilege, or fixation of compensation under the Charter that would require City Council approval, id.
Ch. III, §§ 3(b), 3(d), 3(g), nor does it award severance pay (as opposed to severance benefits) that is banned by the Ordinances. *Page 17 
(City Ord. Ch. No. 5530 §§ 1 2.) Dionne maintains that the City should be estopped from denying him these benefits as other similarly situated municipal employees have received such benefits through past practice.[11]
This Court must determine, therefore, whether the Benefits Agreement is ultra vires and hence unenforceable because the Mayor entered into that agreement with Dionne without the City Council approving its terms. To resolve this question, this Court again must examine the Charter and the Ordinances enacted pursuant to the Charter.
The Charter dictates, in its introductory provisions, that "[a]ll powers of the city shall be exercised in the manner prescribed by the charter or, if not so prescribed, then in such manner as shall be provided by ordinance or resolution of the council." (Charter Ch. I, § 5.) Under the Charter, the legislative power of the City or its departments or agencies is vested in the City Council. Id. Ch. I, § 10 Ch. XVII, Art. I, § 8. The City Council is obligated to adopt any ordinances necessary to implement the Charter. Id. Ch. XVIII, § 8. The Charter requires the City Council to enact an ordinance any time that it wants to "levy any tax," "make an *Page 18 appropriation," "authorize the borrowing of money," "grant a privilege or franchise," "sell or lease real property of the city," "reorganize any offices or departments," "fixcompensation," or "establish a fine or other penalty."Id. Ch. III, § 3(a)-(h) (emphasis added).
The Charter also outlines the duties and powers of the Mayor.Id. Ch. IV, §§ 1-22. It designates the Mayor as the "chief executive and administrative officer of the city . . . responsible for the administration and management of all offices, departments and agencies. . . ." Id. Ch. IV, § 2. It enumerates the duties of the Mayor, as follows:
 (a) To see that the laws and ordinances are enforced;
 (b) To see that all terms and conditions imposed in favor of the city in any contract or franchise are faithfully kept and performed;
 (c) To keep the council informed . . . concerning the financial condition and need of the city and other pertinent matters relating to its administration;
 (d) To recommend to the council such measures as he [or she] may consider necessary and expedient;
 (e) To prepare and recommend to the council an annual budget;
 (f) To prepare and present to the council a comprehensive annual [financial] report . . .;
 (g) To make any study or investigation which . . . may be for the best interests of the city of [sic] which may be ordered by the council by resolution;
 (h) To review all rules and regulations of the several administrative officers [sic] and departments, and only upon his [or her] approval shall they become effective;
 (i) To perform such other duties as may be required of him [or her] by ordinance or resolution of the council.
Id. § 3. The Charter also vests in the Mayor the right to appoint heads of departments and provides that these appointees shall serve for indefinite terms at the pleasure of the Mayor.Id. § 4. It specifically creates the Department of Human Services, among other administrative departments, and grants the Mayor the power to appoint the head of that department.Id. Ch. X, Art. 7, § 1.
While granting the Mayor these powers, a review of the Charter reveals that it does not explicitly or implicitly grant the Mayor the power to establish the salaries or benefits of *Page 19 
department heads or any other municipal employees. Former Mayor Menard and Dionne impliedly conceded this fact in the Benefits Agreement by noting that while "[a]ll other City of Woonsocket employees are covered by the Personnel Code or a Union Contract, mayoral appointees are not." (Benefits Agreement at 1.) In contrast, the Charter gives the City Council the power, by ordinance, to fix compensation, grant privileges and make appropriations — power that seemingly encompasses the setting of salaries and benefits for department heads and other municipal employees. See id.
Ch. III, § 3(b), (d) (g). In addition, any power not expressly granted to the Mayor by the Charter is reserved to the City Council to exercise through the enactment of ordinances. Id.
Ch. I, § 5. Moreover, the power to establish the salaries and benefits for municipal employees is a power of the purse that is distinctly legislative in nature, making it power that the Charter reserves exclusively to the City Council to effectuate through the enactment of ordinances. Id. § 10; Ch. XVII, Art. 1, § 8; Ch. XVIII, § 8.[12]
Indeed, that is precisely what the City Council has done by legislating pay and benefits for classified and appointed municipal personnel — further evidence that the Charter reposes the power to do so in the legislative rather than the executive branch of the City's government. As already discussed, the City Council has legislated the salaries, vacation time, sick leave, overtime pay, healthcare benefits and pensions for classified employees.See id. Ch. IX, §§ 1, 3(a)-(c); City Ord. Ch. No. 1865, App. A, §§ 5.3, 16-18, 23-24; City Ord. Ch. No. 5442 § 2-14.4(a). With respect to elected and appointed personnel, the City Council has set the salaries of the Mayor and its members by ordinance. (City Ord. Ch. 2, Art. II, § 2-15.) It has established the salaries of department directors by ordinance,see id. Ch. No. 7287, § 1 (eff. July 11, 2007), and denied *Page 20 
compensation and benefits for administrative assistants and administrative aides to the Mayor. See City Ord. Ch. 2, Art. II, § 2-30.
With respect to health insurance benefits for municipal employees and elected and appointed officials, the applicable City ordinance provides, as follows:
 (a) The city shall pay the entire cost of health insurance . . . for its full-time, permanent employees, including the following:
 (1) [The] Mayor, directors, and classified personnel[;]
 (2) Municipal employees[;]
 (3) Police department employees[;and]
 (4) Fire department employees.
 . . . .
 (b) The city shall pay the cost of health insurance for municipal retirees and spouses, police department retirees and spouses and widows and fire department retirees and spouses and widows as may be necessary and agreed upon through collective bargaining.
(City Ord. Ch. 2, Art. II, §§ 2-14.4(a) (b) (emphasis added)). Under subsection (a), the City is required to pay health insurance benefits to its full-time, permanent employees (including the Mayor and department heads). See id. § 2-14.4(a). As that statutory provision applies to certain defined categories of municipal "employees," it suggests that the obligation applies to persons who are employed by the City during their tenure in office.Id. Subsection (b), in contrast, speaks not in terms of municipal "employees," but of "municipal retirees."Id. § 2-14.4(b). As such, it sets forth the City's obligation to continue the payment of health insurance for municipal employees upon their retirement. Id. Yet, unlike subsection (a), which includes a health insurance payment obligation for all municipal employees, inclusive of elected, appointed and classified employees (including the Mayor and directors), subsection (b) limits that obligation to municipal retirees "as may be necessary and agreed upon through collective bargaining."Cf. §§ 2-14.4 (a) (b). As collective bargaining does not apply to elected and appointed municipal employees (such as the Mayor and directors), subsection (b) manifests the City Council's intent *Page 21 
to limit the City's obligation to continue payment of health insurance to municipal employees upon retirement to union employees.Id. § 2-14.4 (b).
As Dionne was an appointed non-union employee, he is not entitled to healthcare benefits under the Ordinance. To interpret the statute otherwise would be to ignore its plain meaning in violation of settled precepts of statutory interpretation. See Park v.Rizzo Ford, Inc., 893 A.2d 216, 221 (R.I. 2006) (requiring ordinance to be given its plain and ordinary meaning). To interpret the statute in a way that would categorize all employees, including those in subsections (a) and (b), as both municipal employees and municipal retirees would violate the precept of statutory construction that all words of a statute or ordinance should be given effect. Chang v. University of Rhode Island,375 A.2d 925, 931 (R.I. 1977).[13]
The Ordinances further fail to provide department directors with any other benefits during their employment, such as sick leave, or upon their retirement or resignation, such as payment for unused sick leave or health insurance. Indeed, the Ordinances specifically bar the City from "pay[ing] severance pay to department directors or appointed personnel who are replaced" or "who resign." (City Ord. Ch. 2, Art. II § 2-34 (a) (b).) "Severance pay" includes any "[p]ayment . . . to [an] employee beyond his [or her] wages on termination of . . . employment." BLACK'S LAW DICTIONARY 1374 (6th ed. 1990). Severance pay is "a form of compensation for the termination of the employment relation, for reasons other than the employee's misconduct. . . ." Id. *Page 22 
While Dionne and the City attempt to define severance pay more narrowly as inclusive only of payment of salary rather than salary and benefits upon termination, retirement or resignation, their argument is belied by the language of the Benefits Agreement itself. It provides that "[u]pon termination of employment, voluntary resignation, or retirement, Directors shall be entitled toseverance pay as defined by this document." (Benefits Agreement at 1 (emphasis added).) As the document only provides for the payment of benefits upon termination, retirement or resignation, such as unused vacation time, pension benefits, unused sick time and health insurance, the term "severance pay," as used therein, is clearly not limited to pay and includes benefits such as health insurance and payment for unused sick time. Under the applicable ordinance, therefore, the City is prohibited from awarding Dionne those benefits detailed in his Benefits Agreement, including continued health insurance benefits and payment for unused sick time, as they are a form of severance pay to a director upon resignation (whether a voluntary termination or for purposes of retirement) that the City Council has specifically forbidden. See City Ord. Ch. 2, Art. II §§ 2-34 (a) (b).
Notwithstanding the preclusion of payment to Dionne for unused sick time and continued health care coverage upon his resignation or retirement under the Ordinances, the City and Dionne argue that these Ordinances are trumped by the Charter, which vests unilateral power in the executive branch to dictate the benefits to be afforded to mayoral appointees. They interpret Charter, Ch. XVI, Art. 3 § 1, which provides that:
 [n]o member of the council shall interfere, directly or indirectly, with the conduct of any department, or take any part in the appointment, promotion, or dismissal of any officer or employee in the service of the city, except insofar as is permitted under the provisions of this charter,
to mean that the Mayor need not seek City Council approval for contracts involving appointees.
This interpretation of the Charter, however, is incorrect. This clause was plainly meant to *Page 23 
prevent political intervention in the operation of the departments or the hiring and firing of municipal employees by individual members of the City Council.[14] Dionne's interpretation would eviscerate the City Council's power, granted by Charter, to "make an appropriation," "grant a privilege," and "fix compensation."Id. Ch. III, §§ 3(b) 3(g). Dionne and the City have failed to show how granting the City Council authority to set the compensation and benefits that attach to mayoral appointees interferes in any way with the Mayor's authority to appoint, dismiss or promote any director or otherwise to manage the conduct of departments. Indeed, in the case at bar, the Mayor executed the Benefits Agreement several weeks after Dionne's appointment such that it is difficult to see how it was a part of his appointment. Even if the Mayor had executed the Benefits Agreement in advance of or simultaneously with Dionne's appointment, the City and Dionne cannot claim interference by the City Council with the Mayor's appointment power or management of departments, in violation of the Charter, where the Mayor did not even afford the City Council the opportunity to approve the Benefits Agreement or enact an ordinance as to the benefits to be afforded directors or mayoral appointees, if any, upon resignation, retirement or voluntary termination.
Finally, and perhaps most importantly, the non-intervention clause contains an unambiguous exemption for those City Council actions that are "permitted under the provisions" of the Charter.Id. Without a doubt, the City Council has an important role under the Charter in passing ordinances and budgets and generally approving expenses.
In the chapter entitled "Ordinances," the Charter provides that an ordinance is required specifically in order to "make an appropriation," to "grant a privilege" or to "fix compensation."See Charter, Ch. III §§ 3(a), 3(d), 3(g), respectively. Dionne, without citing any authority, *Page 24 
strenuously denies that health benefits and unused sick day pay can be considered a "privilege" or "compensation." But considering the fact that these benefits are not expressly permitted by municipal law, it is difficult to imagine how they are not a "privilege." Additionally, health benefits and sick day pay easily can be considered "compensation;" indeed, the Rhode Island Supreme Court has defined the term broadly, explicitly determining that "compensation" extends to retirement benefits. In ReCommission on Judicial Tenure Discipline Proceedings,611 A.2d 1375, 1389 (R.I. 1992). The Charter's requirement that an ordinance issue from the City Council in order to "fix compensation" thus applies to all forms of compensation, including health benefits and accrued sick day pay upon retirement, resignation or termination. For the Benefits Agreement to confer such compensation upon Dionne, therefore, it must be approved by the City Council.
Importantly, the Charter also provides that:
 [n]o department or agency . . . shall expend or contract to expend any money or incur any liability or enter into any contract which by its terms involves expenditures of money during the fiscal year in excess of the amounts appropriated, other than . . . for the making of contracts and leases approved by the council.
(Charter, Ch. VII, Art. 3, § 7.) This provision prohibits the Mayor and municipal departments from using any implied residual executive authority to commit the City to any unapproved expenditures.[15]
As if the preceding prohibition were not clear enough, the Charter goes on to prohibit the paying of any funds pursuant to an illegally-executed contract: "Any proposed expenditure not specifically authorized by an appropriation shall be disapproved by the finance department, and no payment of any item so disapproved shall be made by any officer of the *Page 25 
city." Id. § 8. It is therefore abundantly clear that only the City Council has the authority to grant any privilege or compensation that requires the expenditure of funds, and any agreement purporting to expend funds without the authority of the City Council violates the Charter. Because the Benefits Agreement does exactly this, it is illegal and cannot be enforced by this Court.[16]
Yet, the City and Dionne believe that the City Council's authority in this matter is circumscribed by the Charter's enumeration in Ch. VIII, § 10 of purchases requiring City Council confirmation:
 All purchases or contracts in the nature of lease purchase shall not be awarded until approved by resolution of the city council. All purchases or contracts in excess of one hundred thousand dollars . . . or purchases or contracts scheduled to be performed beyond one . . . year shall not be awarded until approved by resolution of the city council.
They argue that since the Benefits Agreement is not a lease purchase, the value of the accrued sick day pay and the lifetime health insurance payments could not exceed $100,000 and that Dionne was an at-will employee such that the Agreement could not be considered to be "scheduled to be performed beyond one . . . year," the City Council has no oversight over the execution of the Agreement, and the Mayor has the authority to enter into such a contract. Id.
This Court disagrees. This section of the Charter is located in the chapter entitled "Purchasing," which governs municipal purchasing and contracting, under the auspices of the purchasing agent appointed by the Finance Director, of supplies, materials, equipment, service or labor after competitive bidding. (Charter, Ch. VIII.) As such, it is inapplicable to the terms and conditions of employment of mayoral appointees and the benefits awarded such employees upon *Page 26 
resignation, retirement or termination of employment. This provision of the Charter in no way alters this Court's analysis under the other provisions of the Charter and Ordinances that require the City Council to approve any benefits to be awarded such appointees upon resignation, retirement or termination (to the extent it has not already prohibited the same legislatively). The failure of the City Council to approve the Benefits Agreement or its terms in this case and the fact that those terms otherwise violate the existing provisions of the Charter and Ordinances thus renders the Agreementultra vires and unenforceable.
Yet, Dionne and the City attempt to prevail notwithstanding the Benefits Agreement's invalidity, arguing that Dionne relied upon the Agreement and that other similarly situated individuals have received continuing health benefits or payment for unused sick leave after resignation or retirement. "It is well-settled in this jurisdiction that a contract provision that violates the law is not enforceable." State v. Yashar, 2007 R.I. Super. LEXIS 45, 111. "`If a statute contains or provides for nondelegable and/or nonmodifiable duties, rights, and/or obligations, then neither contractual provisions nor purported past practices . . . that would alter those mandates are enforceable.'" Id. (quotingState v. Rhode Island Alliance of Social Services Employees,Local 580, 747 A.2d 465, 469 (R.I. 2000)). There can be no dispute in this State that "the government is not bound by `alleged representations . . . [that are] in conflict with applicable law.'" Id. at 114 (quoting Romano v. Ret. Bd. ofthe Employees' Ret. Sys., 767 A.2d 35, 38 (R.I. 2001). In any case, the Rhode Island Supreme Court has insisted that "estoppel cannot be applicable when the acts in question are clearlyultra vires." Technology Investors v. Westerly,689 A.2d 1060, 1062 (R.I. 1997). As the Benefits Agreement is "clearly ultra vires," this Court cannot invoke the doctrine of equitable estoppel to require the City to violate its Charter and *Page 27 
Ordinances in the award of post-resignation healthcare and unused sick leave benefits to Dionne. Id.
 III CONCLUSION
As the Personnel Board lacked jurisdiction to adjudicate this dispute because Dionne was not a classified employee, this Court grants summary judgment in favor of the City and the City Council with respect to the City's administrative appeal in City ofWoonsocket v. Dionne, C.A. No. PC/08-0400 (R.I. Super. Ct. Jan. 22, 2008), denies the cross motion for summary judgment filed by Dionne with respect to that appeal, and vacates the decision of the Woonsocket Personnel Board granting Dionne his requested benefits.
As the Benefits Agreement that Dionne entered into with the former Mayor is ultra vires and unenforceable because neither it nor its terms were approved by the City Council and those terms contravene the Charter and Ordinances, this Court grants summary judgment in favor of the City Council and denies the cross motions for summary judgment filed by Dionne and the City in both consolidated cases and denies and dismisses Dionne's contract-based counterclaim in City of Woonsocket v. Dionne, C.A. No. PC/08-0400 (R.I. Super. Ct. Jan. 22, 2008), and his contract action in Dionne v. City of Woonsocket, C.A. No. PC/08-2805 (R.I. Super. Ct. April 10, 2008). As a result, Dionne is denied continued healthcare benefits and payment for unused sick time. The City may terminate Dionne's health insurance upon reasonable terms and notice to him subject to him reimbursing the City for the cost of those benefits ($182.50 per month) from the date that the Court ordered him to place those monies in escrow to the date of termination of his healthcare benefits. *Page 28 
Counsel shall confer and submit to this Court forthwith for entry in both consolidated cases agreed upon orders and final judgments that are consistent with this Decision.
[1] These facts are culled from the parties' memoranda and appear to be undisputed by them.
[2] On or about June 9, 2000, Dionne executed a benefits agreement with the Chairman of the Board of Canvassers that granted him health and dental coverage mirroring that provided to union employees in the applicable collective bargaining agreement as well as payment for 60% of his unused sick leave upon retirement or death, but not upon employment termination. The parties amended this agreement on October 5, 2004 to allow Dionne to be paid, in full or in part, for unused sick leave upon voluntary, but not involuntary, termination. See Ex. 3 to Dionne's Mem. March 25, 2009.
[3] Dionne also served for four years in the United States Navy and purchased retirement credit for his military time.
[4] The Benefits Agreement contained provisions regarding personal days, vacation, unused vacation time upon termination, pension benefits, sick leave, unused sick time and benefits, including paid holidays, longevity pay, jury duty, bereavement, health and dental coverage, life insurance, professional licenses, registration and training. Other than its provisions regarding payment for unused vacation time and unused sick time, pension benefits, and like benefits to those granted to employees by union contract, the Benefits Agreement contained no other provisions regarding pay upon severance due to voluntary termination, resignation, or retirement.
[5] Dionne filed the grievance after contacting the Mayor, ostensibly as his supervisor under the first step of the grievance process outlined in the Collective Bargaining Agreement, even though he was not a union employee. He claimed that the Collective Bargaining Agreement, referenced in his Benefits Agreement, provided him with a portion of his benefits outlined in the Benefits Agreement.
[6] The Board's vote is not entirely clear. It asked Dionne what, specifically, he was seeking. Dionne responded "`no more, no less than I am entitled to under the Charter or Code.'" See
Mins. at 3, Ex. 4 to Dionne's Mem. In the Board's minutes, however, a parenthetical quantifies his request as "60% of [unused] sick time and `continuation of health insurance benefits.'" Id. Yet, based on Dionne's pleadings, he is seeking the full value of his unused sick days. The Benefits Agreement that he and the former Mayor executed provided for 100% reimbursement for unused sick days in the case of "retirement or death," 60% reimbursement in the case of "involuntary termination or ending of appointed term in office," and no reimbursement upon "voluntary termination." (Ex. 1 to Dionne's Mem.) As the pleadings and the exhibits show that Dionne either voluntarily resigned or retired, neither of these situations can be squared with the 60% figure in the minutes.
[7] The City Council, in January 2008, had retained attorney Larisa as a "consultant" regarding this litigation. At the outset, he and attorney Iuliano entered their appearances as co-counsel for the City. As of September 8, 2008, when the City filed its memorandum opposing Dionne's motion for a preliminary injunction, the City Council (represented by attorney Larisa) disagreed with the City, or perhaps more accurately, former Mayor Susan Menard, as to the arguments to be presented to this Court in opposition to Dionne's request for benefits. Essentially, former Mayor Menard wanted to leave the question of benefits entitlement to the Court, bringing to the Court's attention the language of the Benefits Agreement and the Collective Bargaining Agreement and evidence of past practice that could support Dionne's claim to those benefits. The City Council, protective of its authority, wanted to argue principally that Dionne could not be awarded post-resignation lifetime healthcare benefits and payment for unused sick time by the Mayor unilaterally but that any such contract for benefits required City Council approval.
This disagreement between former Mayor Menard and the City Council as to the arguments to be raised here created a conflict of interest for attorney Iuliano, as he was obligated under the Woonsocket City Charter, as City Solicitor, to "be the attorney for the city and legal advisor to the Mayor, City Council and all other departments, offices and agencies of the City;" yet here, the City, acting through former Mayor Menard, and the City Counsel had divergent interests in the litigation. (Charter, Ch. X, § 2(a).) It also presented a conflict of interest for attorney Larisa because he had entered his appearance for the City in the litigation but now, on behalf of the City Council, took a position adverse to former Mayor Menard.
[8] This Court interprets this stipulation as reflecting consent by the parties to allow the City Council to intervene in these consolidated actions. Regardless, intervention is appropriate because the interest of the City Council in this action in challenging the Benefits Agreement as ultra vires because it was not ratified or its terms approved by the City Council differs from the interest of Dionne and the City in defending that agreement such that the interest of the City Council is not adequately represented by the existing parties. See
R.I. Super. Ct. R. Civ. P. 24(a). In addition, the City Council shares the City's position regarding the jurisdiction of the Personnel Board and, to that extent, allowing it to intervene will not delay or prejudice the adjudication of the rights of the original parties. See id. R. 24(b).
[9] A few days later, Dionne filed an affidavit of the Finance Director of the City of Woonsocket that indicates that retirement benefits for retired municipal employees, including directors, are included in the annual budget submitted to the City Council for review and approval, that those benefits are paid at the time of retirement from appropriated funds (or transfers in the event of a deficit) and that such funds have been approved by the City Council by passage of an appropriation ordinance as part of the annual budget approval process.See Aff. of Przybyla, ¶¶ 1-4. The affidavit states that the appropriation to enable payment of retirement benefits is a projection and can result in a deficit that can be covered by line item transfers within a department, normally done in the fourth quarter. Id. ¶ 5. It further states that the procedures outlined in the affidavit are "currently in effect and to the best of my knowledge is past practice." Id. ¶ 6. The affidavit stops short of establishing, therefore, that the City Council has approved or appropriated monies for retirement benefits for Dionne in the form of continued healthcare benefits and payment for unused sick time as part of the budget process or that those funds have been paid.
[10] Additionally, the City Council claims that the Board lacked jurisdiction over the grievance because it did not concern a timely claim for reinstatement or other job-related action filed by a current, as opposed to a former, employee. It argues further that the Board's decision violated the Rhode Island Open Meetings Act, R.I. Gen. Laws § 42-46-3, so as to render it void and unenforceable. As a result of this Court's decision with respect to the jurisdiction of the Personnel Board, it need not reach these other arguments.
[11] Even assuming, arguendo, that the Benefits Agreement is not ultra vires, as it claims, the City Council argues that it nonetheless provides Dionne with no post-resignation healthcare benefits or payment for unused sick time. It contends that Dionne voluntarily terminated his employment with the City such that he forfeited pay for any contractual unused sick days per the express language of the Benefits Agreement. Alternatively, the City Council contends that the City is not obligated to provide unused sick day pay to retirees and that Dionne is ineligible for continuing health insurance benefits because he did not fulfill the requirement of the Collective Bargaining Agreement that he serve ten consecutive years prior to retirement. Moreover, the City Council claims that the "bridging" mechanism in the contract, whereby non-consecutive years of service can be considered as if served consecutively under certain conditions, only applies for the purposes of providing seniority and does not apply to Dionne because he was not a "classified" employee. As a result of this Court's ruling on the City Council's claim that the Benefits Agreement is ultravires, it need not reach these other arguments.
Finally, Dionne argues that an ambiguously worded amendment to the Ordinances changed the City's rules for allocating healthcare benefits to directors upon retirement such that Dionne would be eligible to receive these benefits under the amended Ordinances. Dionne failed to provide the Court with a copy of this amendment. The City Council disputes Dionne's interpretation of the alleged amendment. As the City Council points out, however, it is unnecessary to interpret this alleged amendment because it purportedly took effect after Dionne's retirement and therefore does not apply to him. The Rhode Island Supreme Court "consistently has declared that statutes and their amendments are applied prospectively, absent clear, strong language . . . [implying] that the Legislature intended a statute to have retroactive application." Rodrigues v. State,985 A.2d 311, 318 (R.I. 2009) (citations omitted). There is no evidence of such directive in the alleged amendment at issue.
[12] To conclude otherwise would be to vest in the Mayor unbridled authority to award his or her appointees with any level of pay and benefits, regardless of whether the City Council agreed to appropriate funds for that purpose in the budget and regardless of the City's ability to pay.
[13] Moreover, as if to emphasize that the omission of elected and appointed officials from the category of municipal retirees entitled to continued healthcare benefits upon retirement was not accidental, and that the expressio unius principle of statutory interpretation should apply in this case, the ordinance takes pains to note that "[o]nly those persons, specifically referred to in subsections (a) and (b) shall be eligible to participate in the city's health insurance plan unless otherwise authorized by thecity council." (City Ord. Ch. 2, Art. II, § 2-14.4(c) (emphasis added).) Additionally, as the Rhode Island Supreme Court has instructed, "an express enumeration of items in a statute indicates a legislative intent to exclude all items not listed." Murphy v. Murphy,471 A.2d 619, 622 (R.I. 1984); accord People v. Valentine,169 P.2d 1, 40 (Cal. 1946) ("`Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed."').
[14] The location of this clause in the Charter makes this even clearer. It is not located in the chapters governing the Council, Mayor, Departments, or Budget, see Charter, Chaps. I, III, IV, and VII and X, respectively, but rather under the chapter entitled "Miscellaneous Provisions." See id. Chap. XVI, Art. 3, § 1.
[15] It is also worth noting that this provision of the Charter allows the Mayor to commit funds in the making of contracts and leases approved by the City Council. (Charter, Ch. VII, Art. 3, 7). It undoubtedly refers back to the section in Chapter VIII of the Charter that requires City Council authorization for those purchases and contracts that extend beyond a year or obligate municipal expenditures in excess of $100,000. Id. Ch. VIII, § 10.
[16] See Tenney v. City and County of Denver,203 P.2d 505, 505 (Colo. l949) (payment of moving expenses of department director held to be ultra vires as intruding on City Council's power to "fix compensation" by ordinance, as dictated by the City Charter, and not an invalid intrusion upon the Mayor's power by Charter to appoint).